**HALPER SADEH LLP**
Zachary Halper, Esq.
36 Kingston Run
North Brunswick, NJ 08902
Tel: (212) 763-0060
Fax: (646) 776-2600
Email: zhalper@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KIMBERLY DOMENICO,<br><br>   Plaintiff,<br><br>   v.<br><br>INSTRUCTURE, INC., JOSH COATES, DAN GOLDSMITH, STEVEN A. COLLINS, WILLIAM M. CONROY, ELLEN LEVY, KEVIN THOMPSON, and LLOYD G. WATERHOUSE,<br><br>   Defendants. | Case No:<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kimberly Domenico ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1.   This is an action against Instructure, Inc. ("Instructure" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a)

1

and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Instructure by PIV Purchaser, LLC ("Parent") and PIV Merger Sub, Inc. ("Merger Sub"), a wholly owned subsidiary of Parent. Parent and Merger Sub are entities that are affiliated with Thoma Bravo, LLC ("Thoma Bravo"), a private equity investment firm.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company conducts business in this District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff is, and has been at all relevant times hereto, an owner of Instructure common stock.

7.     Defendant Instructure provides applications for learning, assessment, and performance management through a software-as-a-service business model worldwide. According to the Company, it conducts substantial business in New Jersey, including with Rowan University

and Rutgers.[1] The Company is incorporated in Delaware. The Company's common stock trades on the New York Stock Exchange under the ticker symbol, "INST."

8. Defendant Josh Coates ("Coates") is the Executive Chairman of the Board of the Company.

9. Defendant Dan Goldsmith ("Goldsmith") is Chief Executive Officer and a director of the Company.

10. Defendant Steven A. Collins ("Collins") is a director of the Company.

11. Defendant William M. Conroy ("Conroy") is a director of the Company.

12. Defendant Ellen Levy ("Levy") is a director of the Company.

13. Defendant Kevin Thompson ("Thompson") is a director of the Company.

14. Defendant Lloyd G. Waterhouse ("Waterhouse") is a director of the Company.

15. Defendants Coates, Goldsmith, Collins, Conroy, Levy, Thompson, and Waterhouse are collectively referred to herein as the "Individual Defendants."

16. Defendants Instructure and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Company and the Proposed Transaction

17. Instructure provides applications for learning, assessment and performance management to enable organizations to develop, manage, and track academic and employee

---

[1] *See* "Instructure Reports Second Quarter 2019 Financial Results," Jul. 29, 2019, https://www.prnewswire.com/news-releases/instructure-reports-second-quarter-2019-financial-results-300892456.html ("In Q2, we added many new customers . . . includ[ing] . . . Rowan University, Global Learning and Partnerships, in New Jersey, [which] will expand its use of Canvas with 50,000 additional learners."); "Rutgers Selects Canvas as Official Learning Management System," Nov. 12, 2018, https://www.instructure.com/canvas/blog/rutgers-selects-canvas-official-learning-management-system.

development.

18. Instructure's products include Canvas (launched in February 2011), a learning management platform for K-12 and higher education, as well as Bridge (launched in February 2015), an employee development and engagement platform. The Company's applications "enhance academic and corporate learning by providing a system of engagement for teachers and learners, enabling frequent and open interactions, a streamlined workflow and the creation and sharing of content with anytime, anywhere access to information."

19. As of September 30, 2019, Instructure serves more than 4,000 customers, including colleges, universities, K-12 school districts, and companies in more than 80 countries.

20. The Company has achieved continued growth. For 2018, 2017 and 2016, the Company's revenue was "$209.5 million, $161.0 million and $112.6 million, respectively, representing year-over-year growth of 30% and 43%." Even more, for the three months ended September 30, 2019, the Company reported revenue of $68.3 million, "representing year-over-year growth of 24%."

21. On December 4, 2019, Instructure issued a press release announcing that it had entered into a definitive agreement to be acquired by Thoma Bravo for $47.60 per share in cash. The press release states, in pertinent part:

> **Instructure Enters Into a Definitive Agreement to be Acquired by Thoma Bravo**
>
> Instructure Stockholders to Receive $47.60 Per Share in Cash; Partnership will Accelerate Innovation and Investment in Long-Term Strategy
>
> NEWS PROVIDED BY
> **Instructure**
> Dec 04, 2019, 08:30 ET
>
> SALT LAKE CITY, Dec. 4, 2019 /PRNewswire/ -- Instructure (NYSE: <u>INST</u>) today announced that it has agreed to be acquired by Thoma Bravo, LLC, a leading

4

private equity investment firm, in an all-cash transaction that values Instructure at an aggregate equity value of approximately $2 billion. As part of the terms of the agreement, Instructure stockholders will receive $47.60 in cash per share. The price per share represents an 18% premium to the Company's 3-month volume-weighted average price as of October 27, 2019, the day prior to the Company's third quarter earnings call at which it announced a strategic review for its Bridge business.

*   *   *

"Instructure's Canvas product is the gold standard for learning management systems in the global education market," said Holden Spaht, a Managing Partner at Thoma Bravo. "We are excited to partner with Dan and the senior management team to support continued investment and innovation in the Company's market leading products and world class customer support."

Brian Jaffee, a Principal at Thoma Bravo added, "We've followed the impressive Instructure growth story for many years and believe Canvas is a highly unique vertical market SaaS leader with exciting scale and future growth potential. We look forward to building on the strong momentum in the business and accelerating growth and product investment both organically and through M&A."

The members of Instructure's Board of Directors have unanimously approved the transaction and recommended that its stockholders approve the merger. A special meeting of Instructure's stockholders will be held as soon as practicable following the filing of a definitive proxy statement with the U.S. Securities and Exchange Commission ("SEC") and subsequent mailing to its stockholders. Instructure's headquarters will remain in Salt Lake City, Utah, with regional offices across the United States and abroad. Closing of the transaction is subject to approval by Instructure stockholders and certain regulatory and antitrust authorities and the satisfaction of customary closing conditions. The transaction is expected to close in the first quarter of 2020 and is not subject to a financing condition. Upon completion of the acquisition, Instructure will become wholly-owned by Thoma Bravo.

The agreement includes a 35-day "go-shop" period expiring on January 8, 2020, which permits Instructure's Board of Directors and advisors to solicit alternative acquisition proposals from third parties. Instructure will have the right to terminate the merger agreement to enter into a superior proposal subject to the terms and conditions of the merger agreement. There can be no assurance that this "go-shop" will result in a superior proposal, and Instructure does not intend to disclose developments with respect to the solicitation process unless and until it determines such disclosure is appropriate or is otherwise required.

J.P. Morgan Securities LLC is serving as the exclusive financial advisor to Instructure and Cooley LLP is serving as its legal advisor. Kirkland & Ellis is serving as legal advisor to Thoma Bravo.

22. On January 7, 2020, Defendants caused to be filed with the SEC a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") pursuant to Section 14(a) of the Securities Exchange Act of 1934 in connection with the Proposed Transaction, which amended the proxy statement that the Company filed with the SEC on January 2, 2020.

23. According to a January 9, 2020 article on Bloomberg.com, Instructure investors "representing a third of the common shares in the education software company are likely to vote against the [Proposed Transaction] . . . over concerns about the sale process and price of the transaction."[2]

### B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions

24. The Proxy Statement, which recommends that Instructure shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Instructure's financial projections; (ii) the financial analyses performed by Instructure's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"), in connection with its fairness opinion; and (iii) potential conflicts of interest involving Company insiders.

25. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger; (ii) Recommendation of the Board of Directors and Reasons for the Merger; (iii) Opinion of J.P. Morgan Securities LLC; and (iv) Management Projections.

26. The shareholder vote on the Proposed Transaction is currently set for February 13, 2020. Unless and until the material misstatements and omissions (referenced below) are remedied,

---

[2] *See* Scott Deveau and Gillian Tan, *Instructure Deal Faces Revolt from Third of Investors*, BLOOMBERG.COM, Jan. 9, 2020, https://www.bloomberg.com/news/articles/2020-01-09/instructure-faces-revolt-from-a-third-of-investors-over-takeover.

6

Instructure shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

**1. Material Omissions Concerning Instructure's Financial Projections**

27. The Proxy Statement omits material information concerning Instructure's financial projections.

28. The Proxy Statement provides "a summary of certain previously nonpublic, unaudited prospective financial information prepared by [Instructure] management for the calendar years 2019-2033[.]" The Proxy Statement provides tables presenting: (1) "Management Projections in the 35% long-term EBITDA margin case"; and (2) "Management Projections in the 40% long-term EBITDA margin case" (collectively, the "Projections").

29. The Proxy Statement, however, fails to disclose the following concerning the Projections: (1) all line items used to calculate (i) Adjusted EBITDA, and (ii) Unlevered Free Cash Flow; and (2) a reconciliation of all non-GAAP to GAAP metrics.

30. When a company discloses non-GAAP financial metrics in a Proxy Statement that was relied upon by its board in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures as such measures can be misleading and "crowd

out" more reliable GAAP information.[3]

31. The disclosure of Instructure's projected financial information is material because it would provide Instructure shareholders with a basis to project the future financial performance of Instructure and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by the Company and its financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

32. Accordingly, in order to bring the Proxy Statement into compliance with SEC regulations, as well as to cure the materially misleading nature of the Projections, Defendants must provide a reconciliation table of the aforementioned non-GAAP metrics to their most comparable GAAP metrics. Defendants must also disclose the line item projections that were used to calculate these non-GAAP metrics. Such projections are necessary to make the non-GAAP projections included in the Proxy Statement not misleading.

33. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Instructure shareholders.

---

[3] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Jan. 23, 2020) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

### 2. Material Omissions Concerning J.P. Morgan's Financial Analyses

34. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning the analyses performed by J.P. Morgan.

35. With respect to J.P. Morgan's "*Public Trading Multiples*" analysis, the Proxy Statement fails to disclose the objective selection criteria and inputs and assumptions for each of the companies selected by J.P. Morgan in its analysis.

36. With respect to J.P. Morgan's "*Selected Transaction Analysis*," the Proxy Statement fails to disclose the objective selection criteria and inputs and assumptions for each of the selected transactions and the value of each transaction.

37. The Proxy Statement fails to disclose the following concerning J.P. Morgan's "*Discounted Cash Flow Analysis*": (1) all line items used to calculate the unlevered free cash flows that Instructure is expected to generate during fiscal years 2020 through 2033 and fourth quarter 2019; (2) the range of terminal asset values of Instructure at the end of fiscal year 2033; and (3) the individual inputs and assumptions underlying the (i) perpetual growth rate ranging from 2.5% to 3.5%, and (ii) range of discount rates from 9.50% to 11.50%.

38. With respect to J.P. Morgan's analysis of equity research analyst price targets for Instructure common stock, the Proxy Statement fails to disclose the following: (1) the individual price targets for Instructure observed by J.P. Morgan in its analysis; and (2) the sources of those price targets.

39. The valuation methods, underlying assumptions, and key inputs used by J.P. Morgan in rendering its purported fairness opinion must be fairly disclosed to Instructure shareholders. The description of J.P. Morgan's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described

above, Instructure shareholders are unable to fully understand J.P. Morgan's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Instructure shareholders.

### 3. Material Omissions Concerning Company Insiders' Potential Conflicts of Interest

40. The Proxy Statement omits material information concerning potential conflicts of interest involving Company insiders.

41. The Proxy Statement provides that, on November 1, 2019, the Board held a meeting with members of Instructure senior management and representatives of J.P. Morgan, during which time the Board discussed recent changes to its stock-based compensation policies. The Proxy Statement provides, in relevant part:

> On November 1, 2019, the Board of Directors held a meeting with members of Instructure senior management and representatives of J.P. Morgan. . . . Following this discussion, the Board of Directors discussed with Instructure senior management aspects of the long-term financial plan and projections prepared by Instructure management, including the fact that such projections would . . . include an increase in operating expenses starting in January 2020 attributable to Instructure's recent modifications of its stock-based compensation policies that would increase the proportion of base compensation that would be paid in the form of cash and reduce the dilutive effect of further stock grants[.]

42. The Proxy Statement, however, fails to disclose the details of all discussions between the Company's officers and directors concerning modifications to the Company's stock-based compensation policies, including the parties to such communications, when they occurred, and the specific content discussed/communicated. Notably, on January 25, 2019, around two weeks after Sponsor A expressed an interest in acquiring Instructure for between $53 to $55 per share, Instructure disclosed in an SEC filing a new policy for rewarding the company's executive

officers, turning their cash bonuses for 2018 into restricted stock units with a 25% higher value, and discontinuing the annual cash bonus program through fiscal year 2022 for multi-year restricted stock unit grants.[4]

43.     Moreover, at a meeting held by the Board on December 3, 2019, the Board discussed "the possibility of establishing a small bonus pool for the purpose of recognizing the efforts of certain employees of [the] Instructure team with respect to the Merger[.]" The Proxy Statement fails to disclose, however, the: (i) identities of those team members the Board considered for the bonus pool; (ii) the dollar value of the bonus pool; and (iii) whether and to what extent the establishment of a bonus pool was first discussed and/or implemented by Board members.

44.     Further, the December 4, 2019 press release announcing the Proposed Transaction provides that "[t]he Instructure management team, led by CEO Dan Goldsmith, will continue to lead the Company in their current roles."

45.     The Proxy Statement, however, fails to disclose the specific details of all employment-related and compensation-related discussions and negotiations concerning the Company's officers and directors, including the parties to such communications, when they occurred, and the specific content discussed/communicated.

46.     Any communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to shareholders. This information is necessary for shareholders to understand potential conflicts of interest of management and the

---

[4] Further, Bloomberg reported that "[t]hree top executives at Instructure Inc. . . . Chief Executive Officer Dan Goldsmith, Chief Financial Officer Steven Kaminsky and General Counsel Matthew Kaminer . . . may reap more than $25 million from stock awards granted shortly after a potential buyer privately approached the educational software maker early this year." Gillian Tan, *Instructure Set Up $25 Million Stock Payoff for Bosses Amid Sale*, BLOOMBERG, Dec. 31, 2019, https://www.bloomberg.com/news/articles/2019-12-31/instructure-set-up-25-million-stock-payoff-for-bosses-amid-sale.

Board. Such information may illuminate the motivations that would prevent fiduciaries from acting solely in the best interests of the Company's shareholders.

47. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Instructure shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

48. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

50. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

51. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

52. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange

Act and Rule 14a-9 promulgated thereunder.

53. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

54. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

56. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

57. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power

to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with and/or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of certain Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

58.     In addition, as the Proxy Statement sets forth at length, and as described herein, certain Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

59.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and

any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

   B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

   C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

   D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

   E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 24, 2020       Respectfully submitted,

               **HALPER SADEH LLP**

               /s/ Zachary Halper
               Zachary Halper, Esq.
               36 Kingston Run
               North Brunswick, NJ 08902
               Telephone: (212) 763-0060
               Facsimile: (646) 776-2600
               Email: zhalper@halpersadeh.com

               Daniel Sadeh, Esq. (*pro hac vice* application forthcoming)
               375 Park Avenue, Suite 2607
               New York, NY 10152
               Telephone: (212) 763-0060
               Facsimile: (646) 776-2600
               Email: sadeh@halpersadeh.com

               *Counsel for Plaintiff*